UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


ROBERT R. BULLOCK,                    )
                                      )
                    Plaintiff,        )
                                      )
          v.                          )          No.  4:12CV2396 TIA
                                      )
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
                    Defendant.        )


## <u>MEMORANDUM AND ORDER</u>

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Robert R. Bullock's

application for disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401, *et seq.*, and his application for supplemental security

income under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are

pending before the undersigned United States Magistrate Judge, with consent of

the parties, pursuant to 28 U.S.C. § 636(c).  Because the final decision is not

supported by substantial evidence on the record as a whole, the decision of the

Commissioner is reversed.

# I. Procedural History

Plaintiff Robert R. Bullock filed his application for disability insurance benefits (DIB) and his application for supplemental security income (SSI) on March 17 and March 18, 2010, respectively, alleging a disability onset date of August 30, 2002. (Tr. 104-05, 106-09.)[1] On May 25, 2010, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 46, 47, 48-52, 53-57.) Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on March 31, 2011, at which plaintiff and a vocational expert testified. (Tr. 20-44.) On April 12, 2011, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform work in the national economy such as laundry worker, bagger, or housekeeper. (Tr. 7-19.) On October 26, 2012, upon review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff argues that the ALJ erred by failing to find his left arm and shoulder condition to be a severe impairment. Plaintiff further argues that the ALJ

---

[1] Plaintiff previously filed applications for DIB and SSI benefits, which were denied July 10, 2006. (*See* Tr. 10.) Plaintiff does not challenge the ALJ's determination here not to reopen these

erred in determining his subjective complaints not to be credible.  Plaintiff also argues that the ALJ failed to consider his non-exertional impairments of pain and fatigue.  Finally, plaintiff contends that the ALJ's RFC determination was not based upon medical evidence.  Plaintiff requests that the final decision be reversed and that he be awarded benefits, or that the matter be remanded for further consideration.

## II.  Testimonial Evidence Before the ALJ

A.    Plaintiff's Testimony

At the hearing on March 31, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-three years of age.  Plaintiff finished the tenth grade in high school and never obtained a GED.  (Tr. 23.) Plaintiff lives in a mobile home with his thirteen-year-old son.  (Tr. 32.)

Plaintiff's Work History Report shows plaintiff to have worked as a carpenter from 1984 to 2002.  (Tr. 147.)  Plaintiff testified that he was self-employed in 2002, doing remodeling and home repair, but that he has not worked since that time.  (Tr. 25.)

Plaintiff testified that he has low back pain and back spasms, as well as pain in his right hip that radiates down his leg.  Plaintiff testified that he sees a pain

applications.

management specialist because of the severe pain he experiences. (Tr. 25-26.) Plaintiff testified that injections he receives every two or three months relieve his back and hip pain but that he continues to have limitations. Plaintiff testified that he is bedridden for two days upon receiving the injections but that he is able to function and is essentially pain-free for about one month thereafter. Plaintiff testified that his pain medication makes him sleepy and dazed, and he is not allowed to drive when taking such medication. (Tr. 30-32.) Plaintiff testified that he frequently naps two to three hours during the day because of such side effects. (Tr. 37-38.)

Plaintiff testified that the pain affects his personality in that he becomes angry and goes into a rage because of it. Plaintiff testified that his relationships have been affected thereby, including estrangement from his wife. (Tr. 37.)

Plaintiff testified that he also experiences problems with his left arm and shoulder in that his left elbow sometimes locks, and he has difficulty lifting and grasping things. Plaintiff testified that he also has problems reaching over his head. Plaintiff testified that he participated in physical therapy the previous year from which he obtained some relief, but that he continues to have problems. (Tr. 27-29.)

As to his exertional abilities, plaintiff testified that he can walk for about fifteen minutes without having to sit, take a break, or lean on something for

support.  Plaintiff testified that he could likewise stand for about ten to fifteen minutes before experiencing spasms and severe pain in his back.  Plaintiff estimated he could lift about twenty pounds with his left hand and could probably lift about twenty pounds using both hands.  Plaintiff estimated that he would be limited to lifting such amount only once or twice a day because of back pain and spasms.  Plaintiff testified that he experiences pain, numbness, and tingling while sitting.  (Tr. 28, 35-37.)

Plaintiff testified that his son performs the heavy chores at home, such as vacuuming, sweeping, and mopping.  Plaintiff testified that he will sometimes wash dishes and pick up clothes but that bending aggravates his back and causes spasms.  Plaintiff testified that he sometimes cooks but mainly prepares frozen dinners.  Plaintiff testified that a neighbor takes care of the yard.  Plaintiff testified that he goes to the grocery store and hangs on to a cart as he goes through the store. Plaintiff testified that his girlfriend goes to the store with him and that his son and girlfriend will lift and carry the heavier items.  Plaintiff testified that he stopped hunting two years prior because of his inability to walk and climb.  Plaintiff testified that he used to enjoy going to bonfires and that he attended one the previous year, but that he left early because he could not sit any longer and did not want to see anyone or have anyone see him.  (Tr. 33-35, 38.)

B.    Testimony of Vocational Expert

Jeffrey Magrowski, a vocational expert, testified in response to questions posed by the ALJ and counsel.

The ALJ asked Mr. Magrowski to consider an individual thirty-four years of age with the same level of education and work experience as plaintiff, and to further consider that such person could "perform a full-range of light work, is able to understand, remember, and carry out at least simple instructions and non-detailed tasks; and can perform at a normal work pace without production quotas." (Tr. 39.)  Mr. Magrowski testified that such a person could not perform plaintiff's past relevant work but could perform light and unskilled work as a laundry worker, of which 1,000 such jobs existed in the State of Missouri and 75,000 nationally; a bagger, of which 1,000 such jobs existed in the State of Missouri and 50,000 nationally; and a housekeeper/cleaner, of which 2,000 such jobs existed in the State of Missouri and over 200,000 nationally.  (Tr. 39-40.)

The ALJ then asked Mr. Magrowski to assume the same individual but that such individual was limited to the exertional demands of sedentary work.  Mr. Magrowski testified that such a person could perform unskilled sedentary work as an order clerk in food and beverage, of which 1,000 such jobs existed in the State of Missouri and 50,000 nationally; a surveillance system monitor, of which 300 such jobs existed in the State of Missouri and over 10,000 nationally; and a call-out

operator, of which 500 such jobs existed in the State of Missouri and over 25,000 nationally.  (Tr. 40-41.)

Plaintiff's counsel asked Mr. Magrowski to assume that the individual from the first two hypotheticals would have to nap for one to three hours at least two or three days a week because of medication side effects.  Mr. Magrowski testified that such a person could not perform the work previously described on a full time basis or any other work in the national economy.  (Tr. 41-42.)

Plaintiff's counsel then asked Mr. Magrowski to assume the same individual to take narcotic pain medication such that the person would consistently have difficulty staying on task, concentrating on instructions, concentrating on simple and unskilled work, and maintaining production quotas.  Mr. Magrowski testified that he was unaware of any jobs that such a person could perform.  (Tr. 42-43.)

### III.  Medical Evidence Before the ALJ[2]

Plaintiff visited Great Mines Health Center (Great Mines) on June 5, 2006, for follow up on low back pain.  Plaintiff reported that he wanted to restart his medication that he stopped a couple of months prior.  Physical examination

---

[2] The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence.  However, inasmuch as plaintiff challenges the decision only as it relates to his physical impairments and not as it relates to any mental impairment, the recitation of specific evidence in this Memorandum and Order is limited to only that evidence relating to the issues raised by plaintiff on this appeal.

showed diffuse low back pain. Straight leg raising was negative. Deep tendon reflexes were 2+ bilaterally. Sensation was intact to light touch. Plaintiff was diagnosed with, *inter alia*, low back pain and was prescribed Flexeril, Mobic, Diclofenac, and Vicodin. (Tr. 317.)

Plaintiff returned to Great Mines on October 6, 2006, and continued to complain of pain. Plaintiff was noted to be angry that the most recent MRI of his back appeared normal. Plaintiff reported having chronic pain since 1995 and that the pain radiates to his right leg. Physical examination showed plaintiff to exhibit some dragging of his right leg with radiating pain when palpated. Some lower spinal protrusion was noted. Plaintiff was administered an injection of Toradol and was prescribed Flexeril and Cymbalta. (Tr. 315.) Physical examination on October 30, 2006, showed continued pain upon palpation to the low spine and right hip. Strength and reflexes were normal. Another injection of Toradol was administered, and plaintiff was referred to a pain clinic. Plaintiff was prescribed Toradol and was given a refill for Flexeril. (Tr. 313.)

An MRI of plaintiff's right hip taken November 1, 2006, in response to his complaints of hip pain showed small bilateral hip joint effusions and a focal area of ischemic necrosis/bone contusion along the subarticular projection of the right femoral head. (Tr. 324.)

Plaintiff visited Dr. Hafiz K. Khattak on November 13, 2006, and complained of right hip pain as well as some low back pain with radicular symptoms. Plaintiff reported the pain to be at a level eight-to-ten out of ten. Plaintiff reported that nothing relieves the pain and that sitting, standing, and walking aggravate the pain. Dr. Khattak noted straight leg raising to be positive and that plaintiff had positive Patrick's test, tenderness on the right side, and myofascial trigger points. Dr. Khattak noted the recent MRI results. Dr. Khattak diagnosed plaintiff with chronic low back pain and right hip pain and ordered an MRI of the lumbar spine. Dr Khattak instructed plaintiff to follow up with Dr. Padda. (Tr. 176.)

An MRI of the lumbar spine taken December 18, 2006, showed transitional vertebrae at the lumbosacral junction, but no evidence of acute herniated disc or spinal stenosis. (Tr. 323.)

Between November 21, 2006, and January 17, 2007, plaintiff visited Dr. Gurpreet Padda at the Center for Interventional Pain Management on four occasions and was administered nerve root block injections, facet joint injections, and sacro iliac joint injections in response to his complaints of low back pain. Plaintiff reported the pain to improve with treatment, with such pain reported to be at a level two on January 17, 2007. (Tr. 177-82, 188-207.) Plaintiff reported to Great Mines during this period that he obtained some relief from injections,

although continued tenderness about the low back and right hip was noted. (Tr. 305, 308-09.)

Plaintiff was admitted to Washington County Memorial Hospital on April 15, 2007, after having overdosed on Toradol and Lorcet. Plaintiff reported having severe, throbbing right hip pain for six years and that he just wanted the pain to go away. Plaintiff reported that he needed a hip replacement but that he did not have insurance coverage. It was noted that plaintiff had reasonably good range of motion of all four extremities with significant pain in the right hip, which somewhat limited his mobility. (Tr. 241-53.)

An x-ray of the lumbar spine taken on June 7, 2007, in response to plaintiff's complaints of back pain yielded normal results. (Tr. 218.) An MRI of the right hip taken that same date showed early osteonecrosis. (Tr. 322.)

On June 20, 2007, plaintiff reported to Great Mines that he had continued pain in his low back and bilateral hips. Plaintiff reported feeling better after taking Lexapro. Plaintiff was referred for re-enrollment in the chronic pain clinic. (Tr. 302.) On July 23, 2007, plaintiff was prescribed Flexeril and Vicoprofin. It was noted that the pain clinic did not accept plaintiff's insurance, and plaintiff was referred to another pain management center. (Tr. 300.) On August 1, 2007, it was noted that plaintiff had an upcoming appointment at a new pain clinic in Farmington, Missouri, and that plaintiff had previously obtained excellent response

from injections for pain. Continued tenderness of the lumbosacral spine and right hip was noted. (Tr. 298.)

Plaintiff visited Advanced Pain Center on August 23, 2007, and complained of constant moderate to severe pain in the lumbar region on the right, radiating to the right lower extremity. Plaintiff reported the pain to interfere with sleep but not with his daily activities. Plaintiff reported excessive fatigue. Physical examination showed moderate to severe tenderness about the lumbar spine at the L4 and L5 levels, about the right hip and thigh area, and in the right buttock. Straight leg raising was positive on the right. Muscle strength, reflexes, and sensation were normal. Dr. Abdul N. Naushad diagnosed plaintiff with right osteoarthritis localized to the pelvic region and thigh, lumbosacral spondylosis without myelopathy, lumbar disorder, and thoracic or lumbosacral neuritis or radiculitis. Naproxen was added to plaintiff's medication regimen. Dr. Naushad instructed plaintiff to restrict any lifting to fifteen to twenty pounds and to not engage in squatting, kneeling, climbing, and twisting. (Tr. 333-36.)

Between September 7 and December 10, 2007, plaintiff visited Advanced Pain Center on six occasions and was treated during that time with lumbar epidural steroid injections and medication, including Flexeril, Vicoprofin, and Naproxen. Plaintiff reported obtaining relief with such treatment, although physical examinations continued to show diffusely moderate tenderness about the L4-L5

levels of the lumbar spine and severe tenderness in the right hip. It was noted that an MRI showed osteonecrosis of plaintiff's hips. Plaintiff continued to report excessive fatigue but reported that his quality of life had improved since beginning treatment. (Tr. 333-58.) During this period, plaintiff reported to Great Mines that his hip pain was controlled with injections and that he experienced the beneficial effect of the injections for about one month. Plaintiff was instructed to continue to follow up with his specialists. (Tr. 290.)

On December 12, 2007, plaintiff reported to Great Mines that he continued to have pain, albeit minimal after receiving injections. Plaintiff reported having recently aggravated his pain one month prior after splitting wood in order to provide heat to his home. Plaintiff was instructed to continue with pain management. (Tr. 288.)

Plaintiff visited Advanced Pain Center on January 4 and February 7, 2008, and reported having obtained good relief after his second epidural injection. Plaintiff continued to report having sleep problems and excessive fatigue. Plaintiff was continued on his medication regimen and was instructed not to engage in frequent lifting in excess of fifteen to twenty pounds and to engage in no squatting, kneeling, or climbing. Plaintiff was also instructed to avoid twisting. (Tr. 359-65.)

Plaintiff returned to Advanced Pain Center on May 2, 2008, and complained of worsening pain. It was noted that plaintiff obtained good relief after his last

epidural injection in December, and another injection was scheduled. Plaintiff was instructed to continue with Naproxen and Vicoprofen. Cyclobenzaprine was also prescribed, and plaintiff was referred for surgical consultation. (Tr. 366-72.) On May 30, 2008, plaintiff reported that he obtained good relief with his most recent injection. Plaintiff was instructed to continue with his current medications. (Tr. 373-75.)

Plaintiff visited Advanced Pain Center on two occasions in July 2008 whereupon he was diagnosed with chronic low back pain with radiculopathy. Plaintiff reported that pain medication reduced his pain level to a range between four and six on a scale of one to ten. Plaintiff denied having any severe side effects from medication. Muscle spasm and tenderness were noted about the lumbar spine, and positive straight leg raising was noted on the right. Range of motion about the lumbar spine was limited because of pain. It was noted that plaintiff had normal range of motion about the left upper extremity with normal muscle strength, tone, and stability. Plaintiff was instructed to continue with his current medications and not to lift in excess of ten pounds. It was noted that plaintiff's activities of daily living had improved with treatment, but that overall plaintiff continued to not be doing well. (Tr. 376-83.) On August 29, 2008, plaintiff reported his pain to be at a level five. Physical examination was unchanged. Plaintiff was prescribed Lidocaine patch and Tramadol (Ultram) and

was instructed to discontinue Naproxen. Plaintiff's compliance with his medication was questioned. It was noted that plaintiff's activities of daily living had improved with treatment, and that overall plaintiff was getting better. (Tr. 384-87.)

In September and October 2008, plaintiff reported to Advanced Pain Center that medication lessened his pain to a level two. Plaintiff was noted to be compliant with his medication. Mild tenderness and spasms were noted about the lumbar spine. Plaintiff continued to complain of excessive fatigue. It was noted that, overall, plaintiff was good. Plaintiff was instructed to discontinue Ultram but to continue with his other medications. No severe side effects were reported. Plaintiff was also instructed not to lift in excess of ten pounds. (Tr. 388-96.)

In November 2008, plaintiff received two epidural injections for his chronic low back pain, from which he obtained moderate relief. Plaintiff reported his pain level to be at a level three. On December 19, 2008, Advanced Pain Center determined to hold off on administering another injection until plaintiff felt he needed one. Physical examination showed mild tenderness and muscle spasm about the lumbar spine with continued positive straight leg raising on the right. Examination of both upper extremities yielded normal results. Plaintiff was instructed to continue on his current regimen, including lifting restrictions. (Tr. 397-413.)

Between January and March 2009, plaintiff visited Advanced Pain Center on three occasions with complaints of increasing pain. On March 13, 2009, plaintiff reported his pain to be at a level eight. Moderate tenderness was noted about the lumbar spine with mild spasms. Plaintiff reported being compliant with his medications and not to have any severe side effects therefrom. Plaintiff's overall functioning was noted to be good. Plaintiff was instructed to continue with his current medications. (Tr. 415-28.) Plaintiff was administered another epidural injection on April 6, 2009, from which plaintiff obtained little relief. Plaintiff continued to complain of pain at a level eight on April 9, 2009. (Tr. 430-37.)

On April 21, 2009, x-rays taken of plaintiff's lumbar spine in response to his complaint of chronic low back pain showed no significant change from the x-rays taken June 7, 2007. Fully segmented six lumbar vertebrae with L5-L6 facet arthritis were noted. (Tr. 210-11.)

Plaintiff returned to Advanced Pain Center on May 13, 2009, and reported an increase in his pain to a level ten. Moderately diffuse tenderness was noted about the lumbar spine as well as moderate tenderness about the sacral spine on the right. Tenderness was also noted about the pelvis on the right. Plaintiff was instructed to continue with his current medications but was advised that such medications may cause drowsiness. Plaintiff was instructed to engage in no frequent lifting over ten pounds with no maximum lifting over ten pounds.

Plaintiff was also instructed to not stoop, bend, or twist more than one time per hour. (Tr. 438-40.) On June 10, 2009, plaintiff was instructed to discontinue Vicoprofen. Endocet (Percocet) was prescribed. (Tr. 446-49.) On July 10, 2009, plaintiff reported that Percocet did not help his pain and that it interfered with his thinking and caused his mind to feel cloudy. Plaintiff was instructed to discontinue the medication, and Dilaudid, Feldene, Nortriptyline, and Orphenadrine Citrate were prescribed. Plaintiff was instructed to apply heat packs to the affected areas and was given instruction as to postural body mechanics. It was noted that, overall, plaintiff was "not good." (Tr. 450-53.)

Plaintiff received another epidural steroid injection on July 28, 2009, which helped to relieve plaintiff's discogenic pain. On August 7, 2009, plaintiff reported his pain to be at a level three or four with pain medications. Plaintiff was continued in his current restrictions and was instructed to continue with his current medications. ( Tr. 454-61.)

Plaintiff visited Great Mines on August 19, 2009, for follow up of a recent emergency room visit for increased back pain. (Tr. 285.)

From September 10 to December 4, 2009, plaintiff visited Advanced Pain Center on four occasions for his chronic low back pain and reported increasing pain. Plaintiff continued to report having sleeping problems and excessive fatigue. Plaintiff requested another steroid injection to the right hip but was informed that

such repeated procedure was contraindicated by his necrosis condition. Tenderness and spasms about the lumbar and sacral spine were mild to moderate, and active range of motion about the right hip and thigh was moderately to severely limited. Plaintiff was prescribed Gabitril and was instructed to continue with his other medications. Plaintiff was also instructed to continue with his current physical restrictions. Plaintiff was advised that his medication may cause drowsiness and was instructed not to take the medication at work. (Tr. 462-77.)

In January and February 2010, plaintiff reported to Advanced Pain Center that his pain was increasing to a level seven to ten. It was noted that plaintiff's opiate medication was no longer helping. Plaintiff reported his sleep to not be good. Physical examination showed moderate tenderness and spasms. Plaintiff was noted to be disheveled in appearance. Plaintiff's low back pain was noted to be consistent with axial discogenic pain and facetogenic pain. Plaintiff was prescribed Robaxin and Parafon Forte (Chlorzoxazone), and his other medications were adjusted. Another steroid injection was scheduled. (Tr. 478-85.)

Plaintiff received another steroid injection on February 25, 2010, after which he reported on March 10, 2010, that he continued to obtain relief therefrom. Plaintiff reported his pain to currently be at a level three to four. Plaintiff reported that he stopped taking Feldene because of its side effects. It was noted that plaintiff's current medications included Chlorzoxazone for muscle spasms,

Dilaudid for pain, and Gabitril for neuropathic pain. Plaintiff's overall functioning was noted to be better. It was noted that insurance did not cover physical therapy. On April 7, 2010, plaintiff reported that the effects of his recent injection were beginning to wear off. It was noted that plaintiff was unable to have injections very often because of his poor blood supply due to osteonecrosis. (Tr. 486-92.)

Plaintiff visited Great Mines on May 10, 2010, and reported a recent onset of left elbow and wrist pain. Physical examination yielded normal results, with normal range of motion, palpation, and joint stability. (Tr. 567-68.) X-rays taken that same date yielded essentially normal results. (Tr. 541, 542.)

Plaintiff returned to Great Mines on May 18, 2010, and requested that they take over his pain management care inasmuch as gas was too expensive for him to travel to Farmington for such care. Dr. Ann Schumacher noted plaintiff's current medications to be Dilaudid, Gabitril, and Parafon Forte. Examination showed tenderness and limited range of motion due to pain about the right lower extremity and right hip. Plaintiff was instructed to continue with his current medications and to return in one month for management. (Tr. 563-64.)

Plaintiff continued to visit Advanced Pain Center from May through July 2010 for his chronic low back pain. Plaintiff reported experiencing back and hip pain at levels ranging between four and eight with medication. Mild to moderate tenderness was noted, as well as moderately to severely restricted range of motion

about the right hip.  Plaintiff had a normal gait.  Plaintiff was instructed to continue with his medications and physical restrictions.  Plaintiff was advised that his medication may cause drowsiness, but no medication side effects were reported. (Tr. 582-89.)

Between June 2 and July 13, 2010, plaintiff participated in eight physical therapy sessions for his complaints of left wrist and elbow pain.  Upon conclusion, plaintiff reported that he no longer dropped things and that his elbow no longer "locked up."  Plaintiff also reported that he no longer experienced sharp pain but that the pain was now dull and "achy."  Plaintiff was discharged from physical therapy because there were no additional orders for therapy.  (Tr. 508-13.)

Plaintiff returned to Advanced Pain Center on August 6, 2010, and reported increased pain.  Physical examination showed severe tenderness and spasms along the lumbar spine, right hip, and sacral spine on the right.  Dr. Abdul Naushad prescribed Methocarbamol and instructed plaintiff to continue with Dilaudid and Gabitril.  Noting Parafon Forte to not be covered by insurance, Dr. Naushad prescribed Robaxin.  (Tr. 590-92.)  On September 8, 2010, plaintiff was started on Cyclobenzaprine because Methocarbamol made him sick.  Plaintiff reported his pain to be at a level five, and physical examination showed mild tenderness.  (Tr. 593-95.)

On September 9, 2010, plaintiff visited Great Mines and reported that he continued to travel to Farmington for steroid injections from which he obtained some relief. Plaintiff also reported having occasional pain in the left arm with radiation to the left shoulder. Plaintiff was referred to Dr. Robert C. Lander, an orthopedist, for further evaluation. (Tr. 553-54.)

Plaintiff visited Dr. Lander on October 18, 2010, with complaints of pain in his left elbow, wrist, shoulder, and low back. Plaintiff reported the shoulder pain to have begun in February 2010 and that his wrist pain was resolving. Dr. Lander noted plaintiff's current medications to include Flexeril and Dilaudid. Physical examination showed plaintiff to have full range of motion about his shoulder and elbow with normal deep tendon reflexes in the biceps, triceps, and radial wrist extensors. Tenderness about the distal humerus was noted. Dr. Lander noted plaintiff's shoulder, wrist, and elbow x-rays to be normal. Dr. Lander also noted plaintiff to have good forward flexion at the waist as well as good lateral flexion. Plaintiff had good heel and toe gait bilaterally, with normal deep tendon reflexes in his knee and ankle jerks. Dr. Lander noted an MRI of the hip to show no evidence of avascular necrosis but some mild reactive changes in the lateral aspect of the acetabulum. Dr. Lander expressed uncertainty regarding the source of plaintiff's pain. Mobic was prescribed. (Tr. 537-38.)

From October through December 2010, plaintiff reported to Advanced Pain Center that he obtained some improvement with medication. (Tr. 597-605.)

On December 9, 2010, plaintiff requested that Great Mines refer him to another orthopedist for a second opinion. Plaintiff reported being dissatisfied with Dr. Lander and that his pain was essentially unchanged despite treatment. Physical examination showed tenderness about the left shoulder with restricted range of motion secondary to pain. No joint instability was noted. Dr. Schumacher noted that plaintiff's current medications were Dilaudid, Flexeril, Gabitril, Parafon Forte, and Robaxin. X-rays were ordered and plaintiff was referred to Dr. Clarence A. Temple for orthopedic evaluation. (Tr. 549-50.)

X-rays of the left shoulder taken December 14, 2010, yielded unremarkable results. (Tr. 535.) An x-ray of the lumbar spine showed multilevel small osteophytes and incidental transitional vertebrae. No pars defects or acute findings were seen. (Tr. 534.)

Plaintiff visited Dr. Temple on January 26, 2011, regarding his complaints of back and hip pain. Physical examination showed limited range of motion about plaintiff's back with mild tenderness to palpation. Plaintiff had marked tenderness about the sciatic nerve in his right buttock. Straight leg raising produced pain on the right. X-rays of the hips showed normal joint spaces and no evidence of bony changes in the femoral heads. X-rays of the lumbar spine showed degenerative

changes at the L5-S1 level, with well-maintained disc spaces.  Dr. Temple diagnosed plaintiff with spondylosis and determined to order an MRI of the lumbar spine to look for evidence of stenosis.  (Tr. 574-75.)

Plaintiff returned to Advanced Pain Center on February 4, 2011, for medication refills.  Plaintiff reported his current pain to be at a level four or five.  (Tr. 606.)

On February 11, 2011, plaintiff continued to complain to Great Mines that he experienced left wrist and elbow pain.  Plaintiff also reported occasional numbness in the fourth and fifth fingers of his left hand.  Examination of the left upper extremity yielded normal results.  An EMG/nerve conduction study was ordered for evaluation of possible carpal tunnel syndrome.  Plaintiff was instructed to continue with his current medications and to wear wrist splints at night.  Plaintiff was referred to orthopedics.  (Tr. 545-47.)

Plaintiff visited Advanced Pain Center on March 2, 2011, for follow up on chronic pain and reported that his medication was helping.  Physical examination showed mild tenderness with no muscle spasm.  Plaintiff reported that the radiating pain down to his ankle had decreased since receiving an injection in January 2011.  Plaintiff was continued on Dilaudid, Cyclobenzaprine, and Gabitril.  (Tr. 607-09.)

Plaintiff returned to Dr. Temple on March 3, 2011, who noted an MRI to show only mild degenerative changes in the lower lumbar area with no evidence of

disc pathology or stenosis. Dr. Temple noted the MRI to also show normal-appearing bone structures. Dr. Temple advised plaintiff that films showed no evidence of avascular necrosis of the femoral heads in the hips and, further, that no evidence of abnormality in the hips was evident with examination. Finally, Dr. Temple advised plaintiff that diagnostic testing showed no structural damage to the lumbar area. Dr. Temple diagnosed plaintiff with chronic lumbar strain and advised that surgery was not indicated. Dr. Temple instructed plaintiff regarding appropriate exercise for this impairment and further instructed plaintiff to take over-the-counter medication for pain. (Tr. 577-80.)

## IV. Medical Evidence Submitted to Appeals Council[3]

Plaintiff returned to Advanced Pain Center on March 30, 2011, and reported his pain to be at a level six. Plaintiff reported that medication helped him. Physical examination showed moderate tenderness with no spasms about the L4-L5 level of the lumbar spine and mild to moderate tenderness about the right hip and thigh. Plaintiff's Cyclobenzaprine, Dilaudid, and Gabitril were refilled. Plaintiff's overall functioning was noted to be "ok." (Tr. 667-69.)

On April 22, 2011, plaintiff underwent nerve conduction studies which

[3] In determining plaintiff's request to review the ALJ's decision, the Appeals Council considered additional evidence that was not before the ALJ at the time of his decision. The Court must consider this evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

showed prolonged right and left median antidromic and orthodromic SNAP latencies, prolonged right and left ulnar antidromic SNAP latencies, and normal right and left median F wave latencies. It was noted that such findings related to median and ulnar nerve entrapment across the wrist. (Tr. 649-52.)

On May 4, 2011, plaintiff reported to Advanced Pain Center that he had been without his muscle relaxer for about one month because of lack of insurance coverage. Plaintiff reported his pain to be at a level eight. Moderate to severe tenderness with mild spasms were noted about the lumbar spine. Tizanadine was prescribed to replace Flexeril. (Tr. 670-72.)

Between May 18 and August 24, 2011, plaintiff visited Advanced Pain Center on five occasions during which time he was administered two epidural steroid injections and obtained some relief. Continued tenderness and spasms were noted about the lumbar spine and right hip during this period, and plaintiff reported his pain to be at levels seven and eight. Plaintiff's overall functioning was noted to be fair. (Tr. 673-87.)

On September 23, 2011, plaintiff reported to Advanced Pain Center that his August 2011 injection was beginning to wear off and that he was currently having radiating pain down his right leg. Mild to moderate tenderness was noted about the lumbar spine with no muscle spasms. Plaintiff was instructed to increase his dosage of Gabitril for nerve pain. (Tr. 690-92.) On October 21, 2011, plaintiff

was instructed to discontinue Gabitril, and Keppra was prescribed. Plaintiff's current medications were noted to also include Baclofen, Coreg, Cyclobenzaprine, Dilaudid, and Lexapro. (Tr. 693-96.)

An MRI of the cervical spine taken October 26, 2011, in response to plaintiff's complaint of neck pain and headaches showed mild broad-based right paracentral disc protrusion at the C5-6 level, contributing to minimal right neural foraminal exit stenosis; and mild broad-based left paracentral disc protrusion at the C6-7 level, contributing to minimal right neural foraminal exit stenosis. No significant central canal stenosis was noted. (Tr. 646-47.)

On November 14, 2011, plaintiff reported to Great Mines that his headaches had improved, but he requested that he be provided another opinion regarding his chronic back and hip pain. Dr. Schumacher noted that plaintiff continued to receive pain management services. (Tr. 643.)

Plaintiff received another epidural steroid injection at Advanced Pain Center on November 17, 2011, after which plaintiff reported continued pain. Plaintiff reported the pain to be tolerable with his medication, but that the medication caused drowsiness. On December 15, 2011, it was noted that plaintiff had recently tripped while carrying firewood, which aggravated his pain. Another injection was administered in January 2012 after which plaintiff reported on February 8, 2012, that his pain was at a level seven. Physical examination showed moderate

tenderness about the lumbar spine at the L3, L4, and L5 levels. Mild to moderate tenderness was noted about the right hip. No muscle spasms were noted. (Tr. 697-708.)

## V. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act on July 11, 2006, but was no longer insured after March 31, 2008. The ALJ found that plaintiff had not engaged in substantial gainful activity since July 11, 2006. The ALJ found plaintiff's lumbar facet arthritis, bilateral hip pain, and depression to be severe impairments, but that plaintiff did not have a condition that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ determined that since July 11, 2006, plaintiff had the RFC to perform light work[4] and was able to understand, remember, and carry out at least simple instructions and non-detailed tasks and perform at a normal pace not involving production quotas. The ALJ found plaintiff unable to perform his past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined plaintiff able to perform jobs that exist in significant numbers in the national economy, and specifically, laundry worker, bagger, or

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal

housekeeper.  The ALJ thus found plaintiff not to be under a disability and denied

plaintiff's claims for benefits.  (Tr.10-16.)

## VI.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must

prove that he is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.

2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir.

1992).  The Social Security Act defines disability as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled

"only if his physical or mental impairment or impairments are of such severity that

he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a

five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v.*

of walking or standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls."  20 C.F.R. §§  404.1567(b), 416.967(b).

*Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, the Commissioner's decision is not supported by substantial evidence on the record as a whole, and the decision must be reversed and the matter remanded to the Commissioner for further proceedings.

A.   <u>Severity of Left Upper Extremity Impairment</u>

As an initial matter, the undersigned finds substantial evidence on the record as a whole to support the ALJ's determination that plaintiff's left upper extremity impairment did not rise to the level of a severe impairment. As noted by the ALJ, repeated medical images of plaintiff's left wrist, elbow, and shoulder yielded normal results; and plaintiff reported a resolution of symptoms in July 2010 upon

completion of two months of physical therapy.  *See Johnston v. Apfel*, 210 F.3d 870, 874-75 (8th Cir. 2000) (response to treatment and normal diagnostic testing supported ALJ's finding that impairment was not severe).  To the extent additional evidence before the Appeals Council shows nerve conduction studies in April 2011 to have yielded positive results, the ALJ's determination as to this non-severe impairment is not affected thereby.  The interpretation of the studies does not indicate the severity of the impairment nor include a diagnosis, and the record shows that plaintiff did not seek further treatment or make any further complaints regarding his left arm and shoulder after undergoing these studies.  *See Banks v. Massanari*, 258 F.3d 820, 826-27 (8th Cir. 2001) (ALJ did not err in finding carpal tunnel syndrome not to be severe where evidence showed diagnosis to be for a mild condition, surgery was never recommended, and no doctor placed restrictions on activities relating to impairment).

B.    Credibility Determination

Plaintiff claims that the ALJ erred in finding his subjective complaints not to be credible.  For the following reasons, plaintiff's argument is well taken.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and

aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). While an ALJ need not explicitly discuss each *Polaski* factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider his subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. *Id.* at 738; *see also Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for

the Commissioner, and not the Court, to make. *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005); *Pearsall*, 274 F.3d at 1218.

The ALJ here identified what he determined to be inconsistencies in the record to support his conclusion that plaintiff's subjective complaints were not credible. Upon review of the record as a whole, however, it cannot be said that the ALJ's adverse credibility determination is supported by substantial evidence.

First, the ALJ determined plaintiff's daily activities to be inconsistent with his subjective testimony that he could not stand or walk more than fifteen minutes. In making this determination, the ALJ referred to plaintiff's testimony that he "grocery shops[, d]oes the cooking and enjoys attending bonfires." (Tr. 14.) The ALJ fails to acknowledge plaintiff's additional testimony, however, that he does not go shopping alone and holds on to a cart while shopping; that he only sometimes cooks and prepares frozen dinners when he does; and that he *used* to enjoy going to bonfires, attended only one the previous year, and left early because he could not sit any longer and did not want to be with people. When considered in context, therefore, plaintiff's daily activities as recited by the ALJ are not so inconsistent with plaintiff's subjective complaints of pain such that the complaints should be discounted as not credible. *See Cline,* 939 F.2d at 565-66 (ALJ must clarify the basis on which daily activities are inconsistent with allegations of pain;

evaluation of extent to which claimant actually performed activities did not support adverse credibility determination).

The ALJ also determined the frequency and intensity of plaintiff's symptoms not to be consistent with a finding of disability.  Specifically, the ALJ noted that analgesic medication and injections were helpful and that no physician imposed any restrictions on plaintiff.  (Tr. 14.)  A review of the record as a whole shows these findings not to be supported by, and indeed to be contrary to, substantial evidence.  With respect to plaintiff's medications, the record shows analgesic and narcotic medications to have been prescribed for moderate to severe pain throughout the entirety of plaintiff's treatment.  Although plaintiff experienced some relief, he nevertheless experienced breakthrough pain on occasion – which necessitated modification of his medications – and he required active pain management on a monthly basis.  In addition, the record shows that while plaintiff obtained the most significant relief from steroid injections, he nevertheless could not receive them continuously because of the contraindications with his osteonecrosis condition of the hip.  Given the nature and strength of the various pain modalities prescribed by pain specialists throughout a period of years for plaintiff's continued diagnosed condition of chronic pain, it cannot be said that plaintiff's allegations of such pain are not credible.  *See O'Donnell v. Barnhart*, 318 F.3d 811, 817-18 (8th Cir. 2003).  A "'consistent diagnosis of chronic . . .

pain, coupled with a long history of pain management and drug therapy,' [is] an 'objective medical fact' supporting a claimant's allegations of disabling pain." *Id.* at 817 (*quoting Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998)).

In addition, the record belies the ALJ's statement that "no physician imposed restrictions" on plaintiff. Indeed, beginning in January 2008 and continuing through, at least, July 2010, physicians at Advanced Pain Center repeatedly instructed plaintiff not to lift in excess of fifteen to twenty pounds – with such restriction later amended to a limit of ten pounds with no frequent lifting over ten pounds – and to not engage in any stooping, squatting, bending, kneeling, climbing, or twisting. Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than he claims is undermined. *Baumgarten v. Chater*, 75 F.3d 366, 368-69 (8th Cir. 1996).

Finally, the ALJ discredited plaintiff's complaints that his medication caused him to be sleepy or dazed, finding the assertions to be "suspect" inasmuch as plaintiff repeatedly denied side effects when asked by a treating source. (Tr. 14.) A review of the record *in toto* shows plaintiff to have consistently complained to his pain specialists that he experienced extreme fatigue. The record also shows the specialists to have repeatedly cautioned plaintiff that his medication may cause

drowsiness. In addition, the record shows plaintiff to have complained to the specialists that some medication caused him to feel cloudy, which led to a change in his medication. To the extent the ALJ determined that plaintiff's various reports to his specialists that he experienced no severe side effects constituted an inconsistency in the record, such inconsistency does not rise to the level of substantial evidence on the record as a whole to support the ALJ's decision to discount plaintiff's testimony. *See Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998). This is especially true here where many of the alleged inconsistencies upon which the ALJ relied to discredit plaintiff's subjective complaints are not supported by, and indeed in some instances are contrary to, the record.

In light of the above, it cannot be said that the ALJ demonstrated in his written decision that he considered all of the evidence relevant to plaintiff's complaints or that the evidence he considered so contradicted plaintiff's subjective complaints that plaintiff's testimony could be discounted as not credible. *Masterson*, 363 F.3d at 738-39. As such, the ALJ's adverse credibility determination is not supported by substantial evidence on the record as a whole. Because the ALJ's decision fails to demonstrate that he considered all of the evidence before him under the standards set out in *Polaski*, this cause should be remanded to the Commissioner for an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in *Polaski*.

C.    RFC Assessment

Where an ALJ errs in his determination to discredit a claimant's subjective complaints, the resulting RFC assessment is called into question inasmuch as it does not include all of the claimant's limitations and restrictions. *See Holmstrom v. Massanari,* 270 F.3d 715, 722 (8th Cir. 2001). A vocational expert's testimony given in response to a hypothetical question based upon such a flawed RFC and that does not include all of a claimant's limitations cannot constitute sufficient evidence that the claimant is able to engage in substantial gainful employment. *Id.*; *Lauer v. Apfel*, 245 F.3d 700, 706 (8th Cir. 2001). Given the ALJ's flawed credibility analysis here and thus the resulting faulty RFC assessment, it cannot be said that the hypothetical question posed to the vocational expert contained all of plaintiff's credible exertional and non-exertional limitations.[5] As such, the ALJ erred in his reliance on the expert's testimony in determining plaintiff not to be disabled. *Holmstrom*, 270 F.3d at 722.

## VII.  Conclusion

Therefore, for all of the foregoing reasons, the Commissioner's adverse decision is not based upon substantial evidence on the record as a whole and the

---

[5] Pain and fatigue are non-exertional limitations. *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (pain); *Mellon v. Heckler*, 739 F.2d 1382, 1384 (8th Cir. 1984) (fatigue).

cause should be remanded to the Commissioner for further consideration. Inasmuch as a claimant's RFC is a medical question, and some medical evidence must support the ALJ's RFC determination, *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010), the Commissioner is encouraged here upon remand to obtain medical evidence that addresses the plaintiff's ability to function in the workplace, which may include contacting plaintiff's treating physician(s) to clarify plaintiff's limitations and restrictions in order to ascertain what level of work, if any, plaintiff is able to perform. *Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007); *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this ___2nd___ day of January, 2014.